IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREG POPER                    :     CIVIL ACTION
                              :
            v.                :
                              :
SCA AMERICAS, INC.            :     NO. 10-3201

MEMORANDUM

McLaughlin, J.                              August 10, 2012

        Greg Poper filed a complaint against his former

employer, SCA Americas, Inc. ("SCA"), asserting four causes of

action: (1) actual and perceived disability discrimination in

violation of the Americans with Disabilities Act ("ADA"); (2)

retaliation in violation of the ADA; (3) actual and perceived

disability discrimination and retaliation in violation of the

Pennsylvania Human Relations Act ("PHRA"); and (4) interference

and retaliation in violation of the Family and Medical Leave Act

("FMLA").  SCA now moves for summary judgment on all claims.  The

Court will grant the motion.


I.    Summary Judgment Record

        The facts presented below are undisputed, unless

otherwise noted.

A.    Plaintiff's Employment with Defendant

        SCA is a global consumer goods company based in Stockholm, Sweden, and maintains its business group headquarters in Philadelphia, Pennsylvania.  The plaintiff began working as a contractor at SCA's Philadelphia location on May 21, 2008, and SCA retained him as a consultant until hiring him as a full-time technical analyst on August 18, 2008.  Def's. Ex. G, Service Order ("Def's. Ex. Q"); Def's. Ex. H, Deposition of Greg Poper ("Poper Dep."); Def's. Ex. I, Deposition of Lori Peapenburg ("Peapenburg Dep.").

        Upon being hired full-time at SCA, Poper's official title was Technical Analyst II.  Def's. Ex. G.  Poper's responsibilities included, ensuring that his organization's information systems functioned properly, making upgrades as necessary, and addressing and fixing Information Technology ("IT") issues that arose.  Poper's position had a customer service orientation, requiring that he be available during business hours and communicate effectively with customers.  Technical Analyst IT Job Description ("Def's. Ex. K").  Poper's "customers" were other SCA employees who contacted him for IT assistance.  Peapenburg Dep. at 84:21-85:2.

        As a technical analyst, the plaintiff was required to help "business operations utilize information systems to improve efficiency," keep "computer equipment, hardware, and software

-2-

updated to meet organizational needs," "[p]articipate in the
deployment, maintenance, support and upgrade of desktops,
laptops, peripherals, and software," and "[r]eceive and respond
to Service Desk escalations to maintain first-hand experience
with incident handling and problem resolution."  Def's. Ex. K at
SCA_000078.

      The job description for the plaintiff's position
provided that individuals working as a Technical Analyst II "must
repeatedly sit, listen, speak, [be] able to answer a telephone,
enter and retrieve dat[a] from a standard desktop computer. The
employee may be required to periodically lift and/or move up to
25 pounds . . .  Environmental factors include the ability to
work in an office environment with normal temperatures."  Id. at
SCA_000079.

      The plaintiff's supervisor at the start of his
employment was Lori Peapenburg, who worked out of SCA's Neenah,
Wisconsin location and supervised the plaintiff remotely.  Def's.
Ex. L, Deposition of Timothy Plaswirth ("Plaswirth Dep.") at 7:1-
8.  In January 2009, plaintiff began reporting to Timothy
Plaswirth, a Lead Technical Analyst at SCA's Philadelphia
location, who in turn reported to Peapenburg.  Peapenburg Dep. at
8:16-18, 9:21-23.

B.    Plaintiff's Alleged Disability

Poper has a long history of back problems.  His back pain began when he was approximately fifteen years old after the car he was riding in was rear-ended by a SEPTA bus.  Poper Dep. at 74:21-23, 75:24-81:1.

Extensive medical records going back to 2004 reveal that Poper has sought treatment for his back pain numerous times, and he has been diagnosed with lumbosacral spondylosis, disc degeneration, disc extrusions, and congenital problems.  The plaintiff visited physical therapists and sought medical treatment on numerous occasions for his back problems, and has had a number of procedures and tests performed.  See Pl's. Ex. LL, Attestation Statement from St. Mary at Langhorne ABS; Pl's. Ex. KK, Final Report from Langhorne MRI Center.  See also Pl's. Exs. S-JJ and MM-SS. (detailing Plaintiff's medical visits, physical therapy treatments, and diagnoses from October 2004- October 2008).

However, an exam performed on April 1, 2009, following a car accident showed "no evidence of fracture or subluxation," Poper's vertebral bodies [were] of normal stature and the disc spaces [were] well maintained," and the test found "no evidence of spondylolysis or spondylolisthesis," nor any destructive lesions.  Def's. Ex. Y, Mercy Suburban Hospital records from 4/1/09 at MSH_000057.

-4-

Poper's back pain periodically flares up, but he was not experiencing severe back pain when he began working at SCA. The plaintiff did not experience limitations due to his back problems while working at SCA until early to mid-May 2009.  Poper Dep. at 75:1-13, 76:10-17, 77:4-6.  Poper's back pain was re-aggravated after a May 2009 car accident.  Poper's back pain from this accident is only documented in his discharge documents from Hanhemann University Hospital dated May 7, 2009.  Poper complained of general back pain during an emergency room visit following a motor vehicle accident, and was given a prescription for Ibuprofen.  Def's. Ex. M, Hanhemann University Hospital Discharge Instructions.

Poper also sought treatment at the Hospital of the University of Pennsylvania on May 15, 2009 in connection with an elbow injury.  This medical record indicates that Poper has suffered from chronic lower back pain in the past due to spinal stenosis, but does not suggest that he complained of any back pain during this visit, and notes the absence of "c-spine tenderness."  Def's Ex. N, University of Pennsylvania Health System Electronic Patient Record ("Def's. Ex. N").

Poper stated that his back problems constitute a "disability" because they sometimes limit his ability to brush his teeth, bend, walk, or lift "more than 30 pounds without really feeling a pain."  The plaintiff testified that his back

-5-

problems beginning in mid-May 2009 resulted in a diminished
ability to lift and walk, limiting him in his position at SCA.
Poper Dep. At 75:24-77:1.

The plaintiff suffered an injury to his elbow and
shoulder as a result of a May 2009 car accident, but does not
claim that this injury was a disability.  Poper. Dep. at 70:1-12.


C.   Defendant's Knowledge Regarding Plaintiff's Back
     Problems

Although Poper never explicitly informed SCA that he
considered his back problems a disability, several SCA employees
were aware that he experienced back pain.

Matt Cassidy, a Human Resource Generalist at SCA, e-
mailed Poper on May 8, 2009, writing, "Either Colleen or Lori
[Peapenburg]. . . mentioned you hurt your back.  I know that your
back is something that bothers you a lot, so I hope it isn't too
serious.  If you have any concerns about work, let me know."
Cassidy testified that Poper did not convey any questions or
concerns about work when asked. Pl's. Ex. N, Deposition of
Matthew Cassidy ("Cassidy Dep.") at 108:20-110:4.

Alex Lekhraj, Director of IT Service Delivery at SCA
during Poper's tenure, testified that he was aware that Poper had
an instance of back pain in April 2009, but did not know of any
chronic issues.  Def's. Ex. X, Deposition of Alex Lekhraj
("Lekhraj Dep."), at 75:17-77:9.

-6-

D.   Plaintiff's Requests for Accommodations

The plaintiff admitted to never making any formal requests for an accommodation regarding his back.  Rather, he testified that he notified SCA about his disability by informing Peapenburg, Plaswirth, and Lekhraj that he "was going to have appointments that [he] needed to make and keep."  Poper said that he told  Peapenburg about his "chronic back problems" from his car accident, and that he told Peapenburg and Lekhraj that he would "probably need to take off time" following his car accident.  No specific date is associated with this request. Poper Dep. at 63:16, 77:15-78:5, 61:8-15, 73:1-4.

Poper also stated that he requested accommodations from SCA with regard to lifting, telling SCA that he would not be able "to carry 75 pound printers around" due to pain preventing him from lifting.[1]  Poper Dep. at 63:2-6.  Plaswirth recalled Poper mentioning that he wanted a cart, but was not aware that this request was related to a medical condition.  Plaswirth ensured that a cart was available for the plaintiff's use following this request.  Plaswirth Dep. at 124:18-125:13.

---

[1] The complaint only mentions the plaintiff's alleged request for "periodic time off from work for medical treatment," and alleges no request for an accommodation with regard to lifting.  The plaintiff did not claim that his statements about lifting were a request for a reasonable accommodation until his opposition to the defendant's motion for summary judgment.

The only time that Poper recalled requesting a need for medical treatment from or to SCA was to take a half day off to have x-rays performed.  Poper Dep. at 85:20-23.  The medical records indicate that x-rays were performed on Poper's arm, elbow, and shoulders, but not on his back.  Def's Ex. N at HUP_000005-07.

In an interrogatory requesting that Poper identify all evidence supporting the claim in his complaint that he asked for periodic time off from work and intermittent leave for treatment, the only evidence that Poper identified was this request.  Poper testified that he informally mentioned to SCA that he would have follow-up appointments, but did not indicate the relevant injury or disability relating to this request.  Poper Dep. at 86:2-6, 86:16-87:4.

E.   Plaintiff's Drug Use

Poper's medical records reveal a long history of drug use.  During a hospital visit in April 2009, a urinalysis performed on the plaintiff yielded a positive result for Benzodiazepine, Tricyclics, and Methadone.  After reporting memory loss, blurred vision, and slurred, incoherent speech, Poper was diagnosed with "Polysubstance usage."  Def's Ex. O, Mercy Suburban Hospital Admission Record.

-8-

In October 2009, several months after his termination
from SCA, Poper sought and received inpatient treatment for his
"Methadone addiction," since "his abuse of unprescribed methadone
resulted in unmanageability."  The plaintiff admitted during his
treatment that he began taking Methadone in 2006, and continued
to take it until October 31, 2009.  Def's Ex. S, Livengrin
Foundation Discharge Summary ("Livengrin Discharge") at 1, 4;
Def's Ex. T, Alcohol/Drugs Report.   The plaintiff's prescription
was for 80 mgs of Methadone, but he regularly took 400 mgs,
taking more of the substance "to get high."  Poper had no "clean
time" over a three year period that subsumes his entire term of
employment at SCA.  Def's. Ex. R, La Paloma Medical Records;
Livengrin Discharge at 8, 15.

In an interview at a treatment center, Poper admitted
to frequently using controlled substances prior to reporting to
work, and on the job.  In January 2010, The plaintiff was
diagnosed with "Opioid Dependence."  Livengrin Discharge at 11,
1-4.

The parties dispute SCA's level of knowledge regarding
Poper's drug use.  Poper stated that he never told Peapenburg
that he was abusing any substances.  Poper. Dep. at 55:18-19.
SCA claims that it was only by the plaintiff's own admission to
Peapenburg of his current drug use that she, Cassidy and Lekhraj

-9-

knew of Poper's addiction.  Cassidy Dep. at 87:22-24); Peapenburg
Dep. at 22:10-13; Lekhraj Dep. at 80:10-22.

Cassidy noted in a running word journal that on May 14,
2009, Poper told Peapenburg that his doctor recommended a six
month program to eliminate the use of painkillers and Methadone.[2]
The journal states that Poper admitted to Peapenburg that "he has
abused Methadone, and his wife now has the Methadone under lock
and key and is responsible for dispensing it to [him]."  Def's.
Ex. U, Cassidy Journal Entry ("Def's. Ex. U").

Peapenburg's deposition testimony mentions that Poper
told her that he had previously been addicted to pain medication,
and that he was taking methadone for this addiction.  Peapenburg
Dep. at 22:18-23.  Poper recalls this conversation and remembers
telling Peapenburg that he was "taking methadone or painkillers,"
but claims he never told her that he was abusing any substance.
He also remembers telling her that he had previously been on
OxyContin, and that the methadone was to allow him to handle
himself better.  Poper Dep. at 55:12-56:16.

A draft of a Performance Improvement Plan created for
Poper prior to his termination states, "The goal is for Greg to
utilize [the SCA sponsored Guidance Resources Program] for, but

_____

[2] Matt Cassidy kept a running word journal starting in November
2008.  He said in his deposition that be began making entries in
the journal around November of 2008.  Cassidy Dep. at 63, 64,
130.

not limited to, assistance in coping with substance abuse."
Def's. Ex. GG, Performance Improvement Plan at SCA_000182.

      F.    Plaintiff's Performance and Behavioral Problems

      Poper was involved in a number of incidents which could
be characterized as behavioral, attendance, or performance
problems.  Although the plaintiff denies allegations of
incoherent and erratic behavior, the facts listed below are not
specifically contested by the plaintiff unless otherwise noted.
Pl's. Mem. in Opp. To Def's. MSJ at 13.

      1.    During the summer of 2008, after Poper was found
asleep in the desk chair of SCA's Chief Financial Officer, Human
Resource Generalist Matt Cassidy promptly asked Plaintiff to go
home for the day.  Cassidy Dep. at 33:19-3, 158:6-12.  Poper did
not dispute this event in his deposition, and recalled being
asked to go home.  Poper Dep. at 39:2-18.

      2.    On September 8, 2008, Cassidy found the plaintiff
noticeably disoriented and requested that he go home. Cassidy
Dep. at 35:4-16.  The plaintiff confirmed this incident, but did
not recall going home for the day.  Poper Dep. at 41:19-42:11.

      3.    The plaintiff was given a verbal warning following
his behavior during candidate interviews and a conference call in
November 2008.  Cassidy Dep. at 59:16-21.  Peapenberg and another
SCA employee, technical analyst Corey Whitaker, observed the

-11-

plaintiff as incoherent during the candidate interviews, speaking randomly about many unrelated subjects at a lunch, and falling asleep during Peapenburg's weekly team conference call.  Def's. Ex. U.  Poper did not recall the precise incident, but did remember explaining to  Peapenburg that his behavior was due to a reaction from his prescribed anxiety medication.  Poper Dep. at 45:18-48:13.

4.    On or about December 10, 2008, the plaintiff's co-worker, who had reported advances by the plaintiff to Human Resources, requested that the plaintiff stop asking her out on a date and that they keep their relationship at a professional level.  Cassidy Dep. at 142:12-22; Def's. Ex. U at SCA_000076.  Poper neither denied nor recalled asking this co-worker out, but did remember her saying that she wanted to keep their relationship professional.  Poper Dep. at 49:14-23.

5.    On December 16, 2008, the plaintiff was in a disheveled and incoherent state and was told to go home.  Def's Ex. U at SCA_000076.  Poper recalled being found in such a state and being asked by coworkers to find a taxi and go home because the coworkers were concerned for his safety.  Poper Dep. at 50.

6.    On April 1, 2009, the plaintiff was involved in a car accident and was absent from work for a week.  These absences were treated as excused under the defendant's attendance policy. Peapenburg Dep. at 28:4-10 (Ex. I).

-12-

7.    Poper was involved in another car accident on May 7, 2009, and missed work that day, and the following day. Peapenburg Dep. at 28:15-18.  Poper does not recall this event, but acknowledges that it is possible that he took these days off. Poper Dep. at 52:10-12, 53.

8.    On May 14, 2009, the plaintiff arrived at work incoherent and slurring his speech.  Plaswirth Dep. 55:21-56:4. Poper recalls receiving a call from Peapenburg on May 14, 2009, asking him to go home for the day because his speech sounded slurred.  Poper Dep. at 54.

9.    On May 15, 2009, after complaining of arm pain, the plaintiff left work early to have his arm examined.  The plaintiff returned to work three days later on May 18, 2009. Def's Ex. U at SCA_000077; Poper Dep. at 65:5-24.

10.   On May 20, 2009, Plaswirth observed Poper in an incoherent state.  Plaswirth Dep. at 74:8-16.  Poper did not recall this incident during his deposition.  Poper Dep. at 69:24-69:6.

11.   On May 21, 2009, Poper did not come to work, and instead visited a hospital in connection with his elbow injury. Def's Ex. Z, E-mail correspondence.  Poper recalls this absence. Poper Dep. at 69:7-10.

12.   Several of Poper's customers reported dissatisfaction with the plaintiff's performance and the level of

-13-

service he was providing.  Peapenburg Dep. at 80:11-85:19, 89:2-6.

    13.  Poper was absent, tardy, or left work early on six occasions between February 23, 2009 and April 17, 2009.  Def's Ex. W, Greg Poper work history; Def's Ex. BB-FF, E-mail correspondence.

    G.    Complaints by Plaintiff's Customers

    Several of Poper's customers reported dissatisfaction with his performance.  Peapenburg Dep. at 80:11-85:19, 89:2-6. SCA employees Bruno Zapeda, Jen Leonhardt, and John Drengler told Peapenburg that Poper had fallen asleep on the job.  Poper Dep. at 82:21-83:19.

    SCA employees Colleen Egan, Megan Oyler, and Kathy Hammond, among others, provided negative feedback to Lekhraj about Poper.  Lekhraj remembered receiving complaints from customers saying that they could not contact Poper, or that he would spend a long time in their offices, sometimes even falling asleep at their desks.  At least ten to twelve individuals came to Lekhraj about issues with Poper. Lekhraj Dep. at 46:5-50:19.

H.   Positive Feedback from SCA Employees Regarding
     Poper's Performance

     Two former SCA employees provided certifications
indicating that Poper had no performance issues.

     William Hall, an employee also working alongside Poper
as a Technical Analyst II until he was terminated by SCA in
November of 2008, stated in his certification that Poper "was a
very good employee, did an excellent job, and did not have any
performance concerns."  Pl's. Ex. I, Cert. of William Hall at
¶ 6.

     During his subsequent deposition, Hall recalled an
incident where Poper fell asleep while Hall was helping him to
activate his Blackberry phone.  While typing in his own email
address, Poper fell asleep and began entering random letters.
Poper awoke, and then fell asleep again.  While Hall was
composing an email alerting Peapenburg of the situation, Hall
observed Poper fall asleep twice and begin snoring. Pl's. Ex. B,
Deposition of William Hall ("Hall Dep.") at 23:2.

     Megan Oyler, a former executive assistant at SCA who
Lekhraj identified as being one of several who complained about
issues related to Poper, also provided a certification.  Oyler
stated that Poper was always polite and professional, and never
saw Poper act in an erratic manner or appear disoriented in the
workplace.  Pl's. Ex. D, Cert. Of Megan Oyler at ¶¶ 6-7.

-15-

I.   <u>Plaintiff's Performance Review and Pay Increase</u>

The only performance review that Poper received during
his time at SCA was his 2008 annual performance review.  Poper
received a weighted rating of 3.35 out of a possible 5. The
review notes that "Poper brings exceptional customer service to
our customers," but also indicates that the plaintiff had a
tendency to become overwhelmed by new tasks and responsibilities,
and was counseled to "give attention to certain tasks without
other interruptions."  Cassidy Dep. at 163:12-17; Pl's. Ex. O,
SLA Performance Summary 2008 at SCA_000142.

Poper received a 3.35% pay increase in January 2009.
Although this increase was called a "merit based increase," the
raise was actually a cost of living adjustment.  Poper was given
less than the 3.7% allotted by the company for such annual pay
increases.  Lekhraj Dep. at 59:17-61:6, 61:14-16; Cassidy Dep. At
103:5-15, 105:6-15..

J.   <u>Plaintiff's Termination by Defendant</u>

After the plaintiff was found incoherent on May 20,
2009, Cassidy began work on a Performance Improvement Plan
("PIP") for Plaintiff.  In drafting the PIP, Cassidy relied on
his running journal, as well as a calendar kept by Peapenburg.[3]

───────────────

[3] Poper claims that this timeline was created in May of 2009, but
the portion of the record cited in support of this allegation
contradicts the plaintiff's claim.  <u>See</u> Peapenburg Dep. at 61,

Cassidy Dep. at 80:1-15, 83:4-9; Peapenburg Dep. at 62:13-23;
Def's Ex. GG, E-mail correspondence.

       After reviewing and discussing the situation with
Cassidy and Peapenburg, Lekhraj independently concluded that
there had been too many behavioral incidents over the course of
Poper's relatively short period of employment at SCA, which
prevented Poper from performing his job.  Cassidy Dep. at 80:8-
18.

       On June 1, 2009, Lekhraj, Cassidy, and Plaswirth met
with Poper and informed him that he would be terminated.  Lekhraj
Dep. at 8:21-8:1, 85:11-21.  Poper was told at this time that the
sole basis for his termination was problems with his performance.
Poper Dep. at 69:14-70:20.


II.  Analysis

       The defendant argues that the plaintiff has failed to
make out a prima facie case of discrimination under the ADA and
PHRA, retaliation under the ADA, PHRA, and FMLA, and interference
under the FMLA.[4]  The defendant also contends that if the
plaintiff was able to establish a prima facie case of

───────────

70.

[4] The plaintiff's ADA and PHRA claims may be considered
simultaneously, since the Acts serve the same goals and are
interpreted coextensively.  Castellani v. Bucks County
Municipality, 351 F. App'x 774, 777 (3d Cir. 2009) (citing Kelly
v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996)).

discrimination or retaliation under the ADA, PHRA, or FMLA, the defendant has proffered a legitimate non-discriminatory reason for terminating the plaintiff, and the plaintiff has failed to show this reason to be pretextual.[5]

### A.   Prima Facie Case of Discrimination Under the ADA and PHRA

The ADA prohibits covered employers from discriminating against disabled individuals.  Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010) (citing 42 U.S.C. § 12112(a) (2006)).  To establish a prima facie case of discrimination, a plaintiff must show (1) that he is disabled within the meaning of the ADA; (2) that he is otherwise qualified for the job, with or

---

[5]This Court should grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). As the party moving for summary judgment, the defendant bears the initial burden of informing the court of the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   The defendant may meet that burden by showing that the party who bears the burden of proof lacks sufficient evidence to support his case.   See Id.  Once a party sufficiently supports a summary judgment motion, the burden shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A fact is "material" for summary judgment purposes if it might affect the outcome of the suit under the governing law.  Id. at 248.  A dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the nonmoving party.  See Sheridan v. NGK Metals Corp., 609 F.3d 239, 251 n.12 (3d Cir. 2010).

without reasonable accommodations; and (3) that he was subjected to an adverse employment decision as a result of discrimination. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

Poper alleges that SCA terminated him due to known health issues relating to his back problems, and because he was perceived as being a drug addict.  SCA argues that Poper is unable to establish a prima facie case for ADA discrimination, because Poper did not have a "disability" within the meaning of the ADA.[6]

Under the ADA, the term "disability" with respect to an individual means (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C.A. § 12102.  The plaintiff claims disability discrimination under the first prong of this definition based on his purported back problems, and under the third prong, claiming that he was perceived to be a drug addict.  See Compl., ¶ 23.

Poper cannot establish that he had an actual disability within the meaning of the ADA because he has not put forth

_____

[6]The defendant also argues that the plaintiff cannot show that he is otherwise qualified for the job because of his poor attendance record.  Because the plaintiff has proffered as least some evidence that his attendance was viewed as adequate, a reasonable jury could conclude that he was qualified for his position.

evidence showing that his back problems constituted impairment substantially limiting a major life activity.  In the wake of the ADA Amendments Act of 2008 ("ADAAA"), it is now easier for a plaintiff to prove that he or she has a "disability" within the meaning of the ADA.[7]  The EEOC regulations provide that,

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).  Generally,

---

[7] Section 2(b)(5) of the ADAAA provides that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  Section 4(a) of the ADAAA provides that the term "disability" under the ADA "shall be construed in favor of broad coverage of individuals."  ADAAA § 4(a) (codified at 42 U.S.C. § 12102(4)(A)).  The ADAAA thus overrules the Supreme Court's definition of "substantially limit" as requiring significant restriction in comparison to the general population.  See Id. at § 2(b)(4)-(5) (superseding Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002)).

the question of whether a plaintiff is substantially limited in performing a major life activity is one of fact.  See Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 763 (3d Cir. 2004).  Consequently, the key question is whether the plaintiff has put forth sufficient evidence such that a finder of fact could determine that he was substantially limited with respect to a major life activity.

A temporary non-chronic impairment of short duration is not a disability covered under the ADA.  Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012) (citing Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002)) (finding that the plaintiff's temporary lifting limitations, removed only four months after first imposed, were "the very definition of such a non-chronic impairment," and thus not an ADA-qualifying disability).  Although Poper has a long history of back problems and treatment related to managing those problems, the only evidence of impairment or limitation relating to his back consists of pain following a car accident.

The only evidence that the plaintiff's back problem limited him with regard to a major life activity is Poper's deposition testimony, where he recalled experiencing limitations in brushing his teeth, bending, and lifting "more than 30 pounds without really feeling a pain."  No specific dates are associated with these limitations; however, Poper testified to experiencing

-21-

no limitations due to his back problem while working at SCA until
early to mid-May 2009.

There is only one document among the 550 pages of
medical records collected in this litigation mentioning
Plaintiff's May 2009 back pain. The document describes Poper's
report of "general back pain" during an emergency room visit on
May 7, 2009 following a car accident. When Poper visited a
hospital on May 15, 2009, he did not complain of back pain, and
the medical record indicates the absence of "c-spine tenderness."

The proffered evidence would not allow a reasonable
juror to conclude that Poper's limitations were anything more
than temporary impairments. The plaintiff's testimony standing
alone is not enough to overcome contradictory medical
documentation and a general absence of supporting evidence.
Thus, Poper has failed to show that he had an actual disability
within the meaning of the ADA.

The plaintiff also claims that he was terminated
because of the defendant's alleged perception of him as a drug
addict. To show that he was regarded as disabled under the ADA,
the plaintiff must show that he either (1) has an impairment that
does not substantially limit major life activities but was
treated by the defendant as constituting such limitation; (2) has
an impairment that substantially limits major life activities
only as a result of the attitudes of others toward such

-22-

impairment; or (3) has no such impairment but was treated by Defendant as having a substantially limiting impairment. Eshelman v. Agere Sys., Inc., 554 F.3d 426, 434 (3d Cir. 2009) (quoting Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187 (3d Cir. 1999)).

Although Poper claims never to have informed Peapenburg that he had a substance abuse problem, there is no dispute that Poper told her that he was taking Methadone for a past addiction to pain killers.  Thus, a question exists as to whether knowledge that Poper was taking Methadone for an addiction to pain killers was sufficient information for SCA to conclude that Poper required "assistance in coping with substance abuse," and ultimately whether SCA treated Poper as having a "substantially limiting impairment."

Nothing in the record suggests that SCA's perception of Poper's drug use differed from what Poper shared with SCA in his conversation with Peapenburg.  Furthermore, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action."  Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996). Nowhere does Poper demonstrate that he was treated as having a substantially limiting impairment.  In the absence of such evidence, no reasonable jury could find that the plaintiff was

regarded as having a disability.

Furthermore, "a qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use. 42 U.S.C.A. § 12114 (West 2009); see also Salley v. Circuit City Stores, 160 F.3d 977, n. 2. (3d Cir.1998). Poper admitted to regularly taking five times his prescribed dosage of Methadone in order to get high, and frequently using controlled substances prior to reporting to work, as well as on the job, and had no "clean time" during his tenure at SCA. SCA denies that knowledge of Poper's substance abuse factored into the company's decision to terminate him. Even if this had been a factor, however, Poper was not disabled under the ADA due to his current drug use at the time of his termination.

B.   Prima Facie Case of Retaliation Under the ADA and PHRA

The plaintiff alleges that the defendant terminated his employment in retaliation for requesting periodic time off. In order to establish a prima facie case of ADA retaliation, the plaintiff must show that: (1) he engaged in protected conduct of which the defendant was aware; (2) he was thereafter subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Williams

-24-

v. Phila. Housing Auth. Police Dep't , 380 F.3d 751, 759 (3d Cir.
2004) cert. denied, 544 U.S. 961 (2005).  Because the plaintiff
is unable to show that he was engaged in protected conduct, his
ADA and PHRA retaliation claims fail as a matter of law.

        Conduct protected from retaliation under the ADA
includes informal activity such as requesting an accommodation
for a disability.  Shellenberger, v. Summit Bancorp, Inc., 318
F.3d 183, 188 (3d Cir. 2003).  The threshold question is whether
Poper's conduct amounted to a request for a reasonable
accommodation.  Under the ADA, an employer has a duty "to engage
in an 'interactive process' of communication with an employee
requesting an accommodation so that the employer will be able to
ascertain whether there is in fact a disability and, if so, the
extent thereof, and thereafter be able to assist in identifying
reasonable accommodations where appropriate."  Williams, 380 F.3d
771.  Discussing the relevant EEOC regulations regarding the
degree of notice an employer must have, the court in Taylor v.
Phoenixville Sch. Dist. stated:

> [W]hile the notice does not have to be in
> writing, be made by the employee, or formally
> invoke the magic words "reasonable
> accommodation," the notice nonetheless must
> make clear that the employee wants assistance
> for his or her disability.  In other words,
> the employer must know of both the disability
> and the employee's desire for accommodations
> for that disability.

184 F.3d 296, 313 (3d Cir. 1999).

SCA claims that Poper never informed anyone at SCA that
his back problem was a disability, or made a request for a
reasonable accommodation.

Poper's request for time off consists of informally
informing SCA that he "was going to have appointments that [he]
needed to make and keep," without providing any specific
information about his alleged disability.  No particular date is
associated with this request.  Additionally, Poper said that he
informed Peapenburg about his "chronic back problems . . . from
[his] car accident," and told Peapenburg and Lekhraj that he
would "probably need to take off time" following his car
accident.

Nothing in the record indicates that SCA was aware that
Poper had back problems rising to the level of a disability.
When SCA's Human Resources department heard that Poper hurt his
back in a car accident, Cassidy contacted Poper on May 8, 2009 to
see if he had any concerns about work.  Poper did not respond
that he required additional assistance or had concerns.
Similarly, Lekhraj knew that Poper had an instance of back pain
in April 2009, but was not aware of any chronic issues.

The one specific absence that Poper requested for a
medical appointment shortly before his termination was a half-day
taken on May 15, 2009, when Poper had x-rays performed on his
elbow and shoulder.  When asked to identify all evidence

-26-

supporting the claim in his complaint that he asked for periodic time off from work, Poper mentioned only this request for a half-day to have elbow and shoulder x-rays performed.

Poper did request a cart to alleviate the need for some of the heavy lifting associated with his work.  Once again, no date or precise timeframe is available regarding this request.  SCA did ensure that a cart was available for Poper's use, but was not aware that this request was prompted by a medical condition.

Poper did not allege in his complaint that his request for accommodations with lifting was protected conduct under the ADA.  Rather, it was only on opposition to the defendant's motion for summary judgment that the plaintiff claimed this event constituted a request for a reasonable accommodation.

Reading the facts in the light most favorable to the plaintiff, a reasonable fact-finder could not conclude on this record that Poper requested a reasonable accommodation, or provided information sufficient for SCA to ascertain that he had a disability and desired accommodations for that disability.

C.   Prima Facie Case of Interference and Retaliation under the FMLA

Poper claims both interference and retaliation under the FMLA.  Both claims are premised on his alleged "request for leave followed by a prompt termination."  Pl. Mem. at 41.  The

Third Circuit has held that "firing an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).

In order to assert a claim of FMLA interference, an employee must show that he was entitled to benefits under the FMLA, and that his employer illegitimately prevented him from obtaining those benefits. See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.2005)).

To establish a retaliation claim under the FMLA, the plaintiff must show that: (1) he invoked his right to FMLA benefits; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the invocation of his rights. Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 146 (3d Cir.2004).

Both parties agree that Poper was eligible for FMLA leave as of May 21, 2009. Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C.A. § 2612(a)(1)(D). Additionally, to be eligible for FMLA leave, an employee must

-28-

have been employed for 12 months and for at least 1,250 hours of
service during the previous 12-month period.  29. U.S.C.
¶¶ 2611(2)(A)(ii), (2)(B)(ii).

Because Poper began his employment at SCA on May, 21,
2008, the first date that he was eligible for FMLA leave was May
21, 2009.  The plaintiff was absent from work on May 21, 2009,
due to residual pain from his elbow injury.  Other than May 21,
2009, Poper took no time off work as an employee eligible for
FMLA leave prior to his June 1 termination.

Poper acknowledges that the only type of leave at issue
in this case is intermittent leave.  Pl. Mem. at 42.  The
relevant regulation states: "FMLA leave may be taken
'intermittently or on a reduced leave schedule' under certain
circumstances.  Intermittent leave is FMLA leave taken in
separate blocks of time due to a single qualifying reason."
29 C.F.R. § 825.202(a) (emphasis added).

The defendant argues that, because the plaintiff's only
day off work as an "eligible employee" under the FMLA was May 21,
2009, and because he was out that day in connection with his
elbow injury, the plaintiff's FMLA claims should be properly
limited to the elbow injury."  When asked to identify all
evidence supporting his claim in his complaint that he asked for
intermittent leave, the only evidence that Poper could point to
was a request to take a half-day off in order to have x-rays

performed on his elbow and shoulder on May 15, 2009.  It follows
that for purposes of analyzing Plaintiff's FMLA claim, the
relevant underlying health condition is his elbow injury that
resulted from his May 2009 car accident.

SCA argues that Poper never provided SCA with adequate
notice of his intention to take FMLA leave in connection with his
elbow injury.  The U.S. Court of Appeals for the Third Circuit
recently dealt with this issue in <u>Lichtenstein v. University of
Pittsburgh Medical Center</u>, 11-3419, 2012 WL 3140350 (3d Cir. Aug.
3, 2012).

In <u>Lichtenstein</u>, the Third Circuit found that the
plaintiff had established a genuine issue of material fact as to
whether she provided adequate notice to her employer about her
need to take FMLA leave.  In that case, the plaintiff's mother
suffered a sudden serious health condition.  The plaintiff called
her supervisor and informed her that she was currently in the
emergency room, that her mother had been brought into the
hospital via ambulance, and that she would be unable to work that
day.  The Third Circuit distinguished the situation in
<u>Lichtenstein</u> from a case where an employee merely gives a generic
reference about going to the hospital because people rushed to
the ER in an ambulance are generally in a more serious health
condition than those who go in of their own accord.  Slip op. 22
n.16.

-30-

In this case, the plaintiff told his supervisors that
he was going to have appointments he needed to make and keep, and
that he would probably need to take some time off following his
car accident.  But when HR asked him whether he had any concerns
about work following his car accident, he did not mention any
concerns.  He took a half-day off to get x-rays on his elbow, but
he offered to come back to work that same day, and was back to
work the following day.

The above facts are not sufficient to reasonably
apprise the employer of his request for time off for a
*serious* health condition, or permit the employer to reasonably
determine whether the FMLA may apply.  Indeed, these facts are
more along the line of generic references about going to the
hospital that the Lichtenstein court specifically distinguished.

Where there is no direct evidence of discrimination,
the Third Circuit analyzes ADA and FMLA disparate treatment and
retaliation claims under the burden-shifting framework announced
in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93
S.Ct. 1817, 36 L.Ed.2d 668 (1973).[8]  See Shaner v. Synthes, 204

---

[8] The Third Circuit has explicitly held that the McDonnell
Douglas framework applies to FMLA retaliation claims only in
unpublished opinions.  See e.g., Parker v. Verizon Pa., Inc., 309
F. App'x 551, 555 (3d Cir. 2009).  Several other circuits have
also applied the McDonnell Douglas framework to both ADA and FMLA
retaliation claims.  See e.g., McArdle v. Dell Products, L.P.,
293 F. App'x 331, 336 (5th Cir. 2008); Bryson v. Regis Corp., 498
F.3d 561, 570 (6th Cir. 2007);  Metzler v. Fed. Home Loan Bank of
Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006); Kersting v. Wal-

F.3d 494, 500 (3d Cir. 2000); <u>Parker v. Verizon Pa. Inc.</u>, 309 F.
App'x 551, 555 (3d Cir. 2009). Under that framework, the
plaintiff must first establish a prima facie case of
discrimination or retaliation. If the plaintiff succeeds in
doing so, the burden of production shifts to the defendant "to
articulate some legitimate, nondiscriminatory reason for the
employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 802. If
the defendant carries its burden, the plaintiff must have the
opportunity to prove that the reasons offered by the defendant
were not its true reasons, but rather a pretext for
discrimination. <u>Shaner</u>, 204 F.3d at 500.

SCA argues that it has proffered a legitimate, non-
discriminatory reason for terminating the plaintiff's employment:
Poper's "erratic behavior, poor attendance, and ultimately, poor
performance."

In order to survive a summary judgment motion where a
defendant has provided a legitimate, non-discriminatory reason
for its employment action,

> the plaintiff must point to some evidence,
> direct or circumstantial, from which a
> factfinder could reasonably either (1)
> disbelieve the employer's articulated
> legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more

Mart Stores, Inc., 250 F.3d 1109, 1117 (7th Cir. 2001); Brungart
v. BellSouth Telecommunications, Inc., 231 F.3d 791, 798 (11th
Cir. 2000); Amir v. St. Louis Univ., 184 F.3d 1017, 1025 (8th
Cir. 1999).

-32-

> likely than not a motivating or determinative
> cause of the employer's action . . . .
>
> [T]o avoid summary judgment, the plaintiff's
> evidence rebutting the employer's proffered
> legitimate reasons must allow a factfinder
> reasonably to infer that each of the
> employer's proffered non-discriminatory
> reasons . . . was either a post hoc
> fabrication or otherwise did not actually
> motivate the employment action (that is, the
> proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "To
discredit the employer's proffered reason, however, the plaintiff
cannot simply show that the employer's decision was wrong or
mistaken, since the factual dispute at issue is whether
discriminatory animus motivated the employer, not whether the
employer is wise, shrewd, prudent, or competent." Id. at 765.

The plaintiff must demonstrate "such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in [SCA's] proffered legitimate reasons for its
action that a reasonable factfinder could rationally find them
'unworthy of credence,'" and "hence infer 'that the employer did
not act for [the asserted] non-discriminatory reasons.'" Id.
(citation omitted).  The plaintiff must show by a preponderance
of the evidence "not merely that the employer's proffered reason
was wrong, but that it was so plainly wrong that it cannot have
been the employer's real reason." Keller v. Orix Cred. Alliance,
Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).

-33-

The plaintiff sets forth a litany of observations and assertions attempting to cast doubt on SCA's proffered reason for Poper's termination.

First, Poper claims that he was never counseled or disciplined during his year working for SCA, and that he was given a good performance evaluation in December 2008, a merit-pay increase for good performance in January 2009, and an email from his management identifying that was [a] valued member of the team.  Pl. Mem. at 38, ¶¶ 1-2.  It is undisputed that Poper received only one performance review during his time at SCA, in which he received a score of 3.35 out of a possible 5.  Poper's "pay increase" was not based on performance, but rather was an annual cost of living increase.

Second, Poper alleges inconsistencies among statements by various SCA employees testifying about the reasons he was terminated.  Lekhraj stated in a June 1, 2009, email informing several SCA managers of the plaintiff's termination that while the plaintiff's performance had been "adequate and well appreciated over the last few months, certain behaviors have again popped up in the last weeks."  However, in his deposition, Lekhraj admitted that he inaccurately described Poper's performance as adequate to his managers to reassure them that his team was competent in hiring people.

-34-

Because the alleged inconsistency in Lekhraj's
statement pertains to no material fact relating to SCA's
proffered reason for termination, and does not suggest that the
explanation provided was false, this portion of the record is
insufficient to establish an inference of pretext.[9]

Poper now claims that he received disparate treatment,
arguing that he was the only employee of at least six employees
supervised by Peapenburg or Lekhraj who was not given verbal or
written warnings for alleged performance problems before
termination. Peapenburg testified to giving PIPs to employees on
two occasions, and Lekhraj indicated that he had done so on four
occasions when employees had performance problems. The
plaintiff, however, cites no evidence detailing the nature of the
alleged performance problems of other SCA employees. Given that
the only evidence of similarity is that these other individuals
also had alleged performance problems, Poper has provided

_____

[9] The plaintiff also points out that Peapenburg agreed in her
deposition that "unquestionably, [the plaintiff's] termination
had nothing to do with poor attendance." Peapenburg Dep. at 92:
2-4. (Pl. Ex. C). Given that the defendant's memorandum states
that Poper was terminated in part due to poor attendance,
Peapenburg's statement raises a possibility of contradiction
which could cast into doubt the defendant's proffered reason for
the plaintiff's termination. However, the plaintiff must cast
doubt on each legitimate reason proffered by Defendant. Fuentes,
32 F.3d at 762. Thus, even if Peapenburg's testimony raises
questions as to whether poor attendance played a role in the
defendant's decision to terminate the plaintiff, this does not
significantly call into question the defendant's claim that the
plaintiff was ultimately terminated due to "poor performance."

-35-

insufficient evidence to support his claim of disparate treatment.

Finally, Poper denies SCA's allegations that he was incoherent or engaged in erratic behavior. Here, Poper provides no evidence contradicting SCA's list of alleged behavior problems and incidents. Rather, the plaintiff relies on the testimony of William Hall, a former SCA Technical Analyst at SCA, and Megan Oyler, a former executive assistant at SCA. The essence of this testimony consists of statements by Hall and Oyler describing how neither of them witnessed Poper behaving erratically. Hall, however, was terminated by SCA on November 8, 2008, and thus was present for less than half of Poper's period of employment at SCA. Despite stating in his certification that Poper "was a very good employee, did an excellent job, and did not have any performance concerns," Hall recalled an incident where Poper fell asleep while Hall was helping him to activate his Blackberry phone. Poper fell asleep and began entering random letters.

Nor has the plaintiff shown that Oyler had such significant interaction with Poper that her testimony that she "did not see him act in an erratic manner or appear disoriented in the workplace" could be giving significant weight in discrediting SCA's numerous allegations of Poper's performance problems.

-36-

In summary, these statements by Hall and Oyler do nothing to undermine the array of performance incidents involving Poper set forth by SCA.

An appropriate order will issue separately.